UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

FRANK MARTZ COACH COMPANY;
GOLD LINE, INC.; GOLD LINE, INC.
OF VIRGINIA; FIRST CLASS COACH
COMPANY, INC.; NATIONAL COACH
WORKS, INC.; NATIONAL COACH
WORKS, INC. OF VIRGINIA; COACH
SERVICE & LEASING, INC.; FMH
LEASING; and FH FAMILY LP,

          Plaintiffs,

    v.               3:21-CV-795
                    (FJS/TWD)
WELLS FARGO EQUIPMENT FINANCE,
INC.,

          Defendant.
_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **HINMAN HOWARD & KATTELL, LLP**<br>700 Security Mutual Building<br>80 Exchange Street<br>P.O. Box 5250<br>Binghamton, New York 13902<br>Attorneys for Plaintiffs | KIMBERLY M. KOSTUN, ESQ. |
| **HOURIGAN, KLUGER & QUINN**<br>600 Third Avenue<br>Kingston, Pennsylvania 18704<br>Attorneys for Plaintiffs | JAMES T. SHOEMAKER, ESQ. |
| **BALLARD SPAHR LLP**<br>1675 Broadway, 19th Floor<br>New York, New York 10019<br>  -and-<br>1735 Market Street<br>51st Floor<br>Philadelphia, Pennsylvania 19103<br>Attorneys for Defendant | MARJORIE J. PEERCE, ESQ.<br>JUSTIN WARD LAMSON, ESQ.<br>MATTHEW A. WHITE, ESQ. |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. BACKGROUND

Plaintiffs are businesses that provide motor coach services and leased their motor coaches from non-party M&T Credit Corporation. *See* Dkt. No. 2, Compl., at ¶¶ 11-14. Defendant ultimately acquired the equipment leases from M&T. *See id.* at ¶ 12. According to Plaintiffs, the lease agreements had been in place since July 14, 2004, and they ended on November 1, 2020. *See id.* at ¶ 42; Dkt. No. 2, Exs. A, B. As relevant here, riders incorporated into the leases provided that, at the end of the leases' terms, Plaintiffs could (1) purchase the motor coaches for 25% of the equipment cost or (2) sell the motor coaches in a commercially reasonable manner. *See* Dkt. No. 2 at ¶¶ 14-15. The lease agreements also required Plaintiffs to notify Defendant whether they intended to exercise the sale option or return the motor coaches; and, if Plaintiffs did not exercise those options, the leases automatically renewed.[1] *See* Dkt. No. 2, Ex. A, at ¶ 24.

---

[1] The leases provide the following, in relevant part:

> **24. Purchase Option and Automatic Renewal.** Lessee [Plaintiffs] shall have only such option to purchase the Equipment upon expiration of the Lease as specified in a separate Purchase and Renewal Option Rider ("Rider") to the Schedule. Any option shall be suspended during the existence of any Event of Default. In addition, in the event Lessee does not intend to exercise the Purchase or Renewal Option as provided for in the Purchase and Renewal Rider attached hereto and made a part hereof, Lessee must notify Lessor [Defendant] of its intent to return the Equipment at least one hundred twenty (120) days but not more than two hundred seventy (270) days prior to the Base Term Expiration Date. . . . Until and unless Lessee provides Lessor with the notice required hereunder, the Lease shall automatically renew for additional twelve (12) month terms, during which time all of the

As a result of the COVID-19 pandemic, Plaintiffs had to completely suspend charter and tour services in March 2020, as well as suspend their services out of New York City, Philadelphia, St. Petersburg, and Washington D.C, which resulted in a 60% drop in their revenue.  *See* Dkt. No. 2 at ¶ 16.  Plaintiffs allege that, in April 2020, they "entered into amendments" with Defendant that provided them a ninety-day deferment on their financing obligations through June 2020, and Plaintiffs received a second ninety-day deferment through September 2020.  *See id.* at ¶¶ 18-21.  As their leases neared the end of their terms, Plaintiffs contend that they continued negotiating with Defendant from October 2020 through December 2020 "to limit the anticipated loss for both parties[.]"  *See id.* at ¶¶ 25-29.  However, in December 2020, Defendant advised Plaintiffs that they would need to pay $655,621.34 in past-due rent before they could exercise one of the end-of-term options.  *See id.* at ¶ 29 (citing Dkt. No. 2, Ex. D, at 77).  Plaintiffs allege that, knowing that they would have to negotiate their final end-of-term options, Defendant facilitated Plaintiffs' refinancing of the motor coaches through the Main Street Lending Program at non-party FNCB Bank.  *See id.* at ¶¶ 31-35.

Nonetheless, Plaintiffs contend that, in January 2021, Defendant informed them that the leases had automatically renewed in November.  *See id.* at ¶ 36.  In February 2021, Defendant allegedly told Plaintiffs that, despite the lease terms having ended, they needed to pay past-due rent for November 2020 through February 2021, as well as pay late fees.  *See id.* at ¶ 38.  Plaintiffs allege that, "[a]t no time during numerous conversations between Plaintiffs' representatives and Defendant's representatives, wherein Plaintiffs' representatives advised

---

        terms and conditions of the Lease and Schedule will remain in full
        force and effect.

*See* Dkt. No. 2, Ex. A, at ¶ 24.

Defendant's representatives that Plaintiffs were still considering their end of lease options and good faith offers to Defendant, did Defendant's representatives ever raise the issue of automatic renewal or notice deadline, thereby leading Plaintiffs to believe that Defendant afforded Plaintiffs an undefined period of time to decide their course of action[.]" *See id.* at ¶ 39. Plaintiffs contend that, at this time, they wish to exercise the sale option pursuant to the riders incorporated in the lease terms, and Plaintiffs have "suggested and attempted in good faith to negotiate a sale at a reduced purchase price and financed on manageable terms[.]" *See id.* at ¶¶ 43-44. Plaintiffs assert that Defendant has now found them to be in default, and has demanded payment of $4,639,233.52, accounting for the money that Plaintiffs owe it for past-due rent, late fees, and to purchase the motor coaches pursuant to the sales option. *See id.* at ¶¶ 56, 67, 76, 86; *see also* Dkt. No. 2, Ex. G, at 85-86.

      As a result of the foregoing, Plaintiffs commenced this action in New York State Supreme Court, Broome County, alleging the following five causes of action: (1) declaratory judgment, (2) commercial bad faith, (3) detrimental reliance, (4) fraudulent misrepresentation, and (5) negligent misrepresentation. *See id.* at ¶¶ 45-88. Plaintiffs generally allege that Defendant renewed the leases and sought accelerated recovery with "no basis in the lease documents, as amended." *See id.* at ¶¶ 52, 64. As a result of Defendant's declaration of default, Plaintiffs allege that they are "at risk of default in other commercial obligations in the amount of $20,000,000.00, exclusive of interest," and are "also at risk of losing the availability of an additional $4,500,000.00 in line of credit financing." *See id.* at ¶¶ 57-58, 68-69, 77-78, 87-88. Plaintiffs therefore demand judgment against Defendant in an amount in excess of $20 million, plus interests, costs, punitive damages, and counsel fees. *See id.*

Defendant removed the action to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1441(a). *See* Dkt. No. 1. Defendant then moved to dismiss Plaintiffs' second, third, fourth, and fifth causes of action. *See* Dkt. No. 21.[2] That motion is pending before the Court.[3]

## II. DISCUSSION

**Whether Plaintiffs have suffered an injury-in-fact as to give them standing to pursue their action before this Court**

In Defendant's reply brief, it raises the issue of whether Plaintiffs have Article III standing to bring their claims. *See* Dkt. No. 27, Def's Reply, at 7. According to Defendant, there is "no certainty as to the fact of damages" because Plaintiffs merely alleged that they feared "risk of default" and "risk of loss" of additional lines of credit, which are not so concrete or imminent as to satisfy Article III's requirements. *See id.* (quoting Dkt. No. 2 at ¶¶ 57-58, 68-69, 77-78, 87-88).

"Under Article III of the Constitution, federal courts may only decide 'actual cases and controversies.'" *Cole v. Zucker*, No. 1:17-CV-251 (FJS/CFH), 2019 U.S. Dist. LEXIS 31714, *12 (N.D.N.Y. Feb. 28, 2019) (Scullin, S.J.) (quoting *Lee v. Bd. of Governors of Fed. Reserve Sys.*, 118 F.3d 905, 910 (2d Cir. 1997) (citation omitted)). "'The federal courts are under an independent obligation to examine their own jurisdiction,'" including standing as a matter of

---

[2] Defendant further contends that Plaintiffs' first cause of action for a declaratory judgment should fail as well, "but that claim's demise will have to await a motion for judgment on the pleadings." *See* Dkt. No. 21-2 at 2 n.1.

[3] Notably, Defendant also filed a separate, related lawsuit, raising what are essentially counterclaims, against Plaintiffs for breach of contract and conversion. *See* Case No. 3:22-CV-160 (FJS/TWD), Dkt. No. 1.

- 5 -

subject matter jurisdiction; and courts may consider it at any time and even if the parties have failed to raise the issue. *United States v. Hays,* 515 U.S. 737, 742 (1995) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230-231, 107 L. Ed. 2d 603, 110 S. Ct. 596 (1990) (citations omitted)). "To establish that a case or controversy exists so as to confer standing under Article III, a plaintiff must satisfy three elements: (a) the plaintiff must suffer an 'injury in fact,' (b) that injury must be 'fairly traceable' to the challenged action, and (c) the injury must be likely to be 'redressed by a favorable decision' of the federal court." *NRDC, Inc. v. United States FDA*, 710 F.3d 71, 79 (2d Cir. 2013) (quoting [*Lujan v, Defenders of Wildlife*, 504 U.S. 555,] 560-61 [(1992)] (alteration omitted)). "The party asserting jurisdiction . . . bears the burden of proof as to standing." *Id.* (citing *Lujan*, 504 U.S. at 561).

"To demonstrate injury in fact, a plaintiff must show the 'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) (quoting [*Lujan*, 504 U.S.] at 560 (internal quotation marks omitted)). The Supreme Court has made clear that "an injury in fact must be both concrete *and* particularized." *Spokeo, Inc. v. Ronins*, 578 U.S. 330, 340 (2016) (collecting cases). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* (citing Black's Law Dictionary 506 (10th ed. 2014)). The Court in *Spokeo* further clarified that a concrete injury is "'real,' and not 'abstract.'" *Id.* (quoting Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)). "'Concrete' does not necessarily mean 'tangible'; rather, 'intangible harms,' such as the 'risk of real harm,' can, in some circumstances, satisfy the 'concreteness' requirement." *Cole*, 2019 U.S. Dist. LEXIS 31714, at \*14-\*15 (quoting *Spokeo*, 136 S. Ct. at 1549 (parenthetical and citations omitted)). However, when the Supreme Court has found standing in

such circumstances, it is "based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (collecting cases).

The Court finds that Plaintiffs have not alleged an injury-in-fact sufficient for them to have standing. Plaintiffs generally allege that they did not believe, based on their conversations with Defendant's representative, that their leases would automatically renew at the end of the term. *See generally* Dkt. No. 2 at ¶¶ 25-41. Plaintiffs seek a declaration that the leases have not renewed and claim that they wish to exercise the sale option pursuant to the riders to the lease agreements to purchase and finance the motor coaches. *See id.* at ¶¶ 43-44, 49. As a result of the leases' renewals, Plaintiffs allegedly owe Defendant nearly $700,000 in unpaid rent and late fees; and, if they wished to purchase the motor coaches, they would owe Defendant a total of $4,639,233.52. *See* Dkt. No. 2, Ex. G, at 86. It is undisputed that Plaintiffs have not paid rent for or any other money toward the motor coaches since the lease terms expired in November 2020, nor do the parties dispute that Plaintiffs have not returned those motor coaches to Defendant. *See generally* Dkt. No. 2 at ¶ 42; Dkt. No. 21-2 at 9. Thus, the Court notes that Plaintiffs have allegedly had the motor coaches in their possession and for their use in their businesses, without making any payments, since November 2020.

In addition to requesting a declaration that the leases not be renewed and that they be entitled to the sale option to purchase the motor coaches, Plaintiffs seek $20 million in damages, plus interest, costs, punitive damages, and counsel fees from Defendant. This is because Plaintiffs "are now at risk of default in other commercial obligations in the amount of $20,000,000.00, exclusive of interest" and "are now also at risk of losing the availability of an additional $4,500,000.00 in line of credit financing." *See* Dkt. No. 2 at ¶¶ 57-58, 68-69, 77-78,

87-88. However, Plaintiffs have not identified to whom they would default in their commercial obligations, how those obligations constitute $20 million, or how that risk would be so substantial that it would cause them to reasonably incur costs to mitigate the harm. They also have not alleged how paying the late rent, fees, and costs for purchasing the motor coaches would cause them to default on those obligations since that is essentially the relief Plaintiffs are seeking in their first cause of action. Furthermore, Plaintiffs have not alleged how the risk of losing a line of credit for $4.5 million would be so substantial that it would cause them to reasonably incur costs to mitigate the harm.

For these reasons, the Court finds that Plaintiffs' alleged injuries, *i.e.*, a risk of indebtedness in a generalized, large sum to unknown obligors and a risk of losing a line of credit to Defendant, do not constitute "concrete" injuries-in-fact as Article III requires. Instead, they are abstract and speculative. Accordingly, the Court dismisses Plaintiffs' complaint in its entirety for lack of subject matter jurisdiction because Plaintiffs have not shown that they have standing.[4]

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

---

[4] Although Defendant did not move to dismiss Plaintiffs' first cause of action for a declaratory judgment, the Court notes that "a request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) (quoting *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72, 94 L. Ed. 1194, 70 S. Ct. 876 (1950)). "[A] declaratory judgment is a remedy, not a cause of action." *Clayton's Auto Glass, Inc. v. First Data Corp.*, No. 12-CV-5018 (JS) (AKT), 2013 U.S. Dist. LEXIS 141444, *21 (S.D.N.Y. Sept. 30, 2013) (citations omitted). Therefore, the Court dismisses the complaint in its entirety rather than merely the second, third, fourth, and fifth causes of action as Defendant requests.

**ORDERS** that Defendant's motion to dismiss Plaintiff's complaint, *see* Dkt. No. 21, is **GRANTED**, and Plaintiff's complaint is dismissed in its entirety because Plaintiffs lack standing to bring their claims; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendant and close this case.

**IT IS SO ORDERED.**

Dated: March 16, 2022
Syracuse, New York

*/s/ Frederick J. Scullin, Jr.*
Frederick J. Scullin, Jr.
Senior United States District Judge